HUEY P. AND JORI SAVAGE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Savage v. Commissioner
Docket No. 289-89
United States Tax Court
T.C. Memo 1992-129; 1992 Tax Ct. Memo LEXIS 146; 63 T.C.M. (CCH) 2269; T.C.M. (RIA) 92129; March 3, 1992, Filed *146 Decision will be entered under Rule 155. Dennis G. Harkavy, for petitioners. Marsha R. Yowell, Carl D. Inskeep, and Tracy E. Stetson, for respondent. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Larry L. Nameroff pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE NAMEROFF, Special Trial Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6653(b)(1)
Sec. 6653(b)(2)
1980
$ 552,965
$ 276,483
-- --      1981
317,835
158,918
-- --      1982
150,036
--  $ 75,018
50% of the interest
due on $ 150,036
1983
17,247
--  8,624
50% of the interest
due on $ 17,247
*147 Additions to Tax
Year
Sec. 6661(a)
1980
--    1981
--    1982
$ 37,509
1983
4,312
In the alternative to the above fraud additions to tax, respondent determined that petitioners are liable for the negligence additions to tax under section 6653(a) for 1980 and section 6653(a)(1) and (2) for 1981, 1982, and 1983. After concessions, the issues remaining for decision are: (1) Whether petitioners understated their taxable income for each of the years 1980 through 1983 in the amounts determined by respondent by utilizing the net worth method; (2) whether the underpayments of petitioners' Federal income taxes for each of the years 1980 through 1983 were due to the fraud of petitioner Huey P. Savage; [2] (3) whether the assessment and collection of the deficiencies for 1980 and 1981 are barred by the statute of limitations; (4) whether petitioners are liable for the additions to tax under section 6661(a) for 1982 and 1983; (5) whether petitioners had a net operating loss in 1985 which may be carried back to 1982; and (6) whether petitioner Jori Savage qualifies for innocent spouse relief under section 6013(e). *148 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in El Toro, California, when the petition was filed in this case. Background
Huey P. Savage (petitioner) has worked in the circuit board industry since 1966. In June 1971, he founded Western Circuits Inc. (Western), a company that manufactures and sells printed circuit boards. Petitioner put all of his Western stock in the name of a nominee, Terence Cooney (Cooney), who, at one time, apparently was the attorney for the company. On its Federal corporate tax return (Form 1120) for the period ended March 31, 1980, the stockholders were listed as petitioner (via Cooney) 52 percent, Mario Mendoza (Mendoza) 13 percent, and Mel Walter (Walter) 12 percent. The remaining 23 percent has not been identified. In January 1973, Data Circuits Inc. (Data), was incorporated by petitioner and his sister Kathy Hales Turner (Turner), with petitioner having a 60-percent interest and Turner having a 40-percent interest. Subsequently, petitioner and Turner each sold Walter 2 1/2-percent interests in Data. *149 In addition, sometime later but prior to 1979, Turner traded a 10-percent interest in Data to Mendoza for a 5-percent interest in Western. Data was also engaged in the manufacture and sale of circuit boards. Walter was the controller for both Data and Western. Mendoza was the president of Western. The process of manufacturing printed circuit boards requires the use of gold salts and gold baths. Metallic gold is a by-product of the manufacturing process, and reclamation of used printed circuit boards also results in the ability to recover metallic gold. In late 1973 or early 1974, petitioner, Turner, Walter, and Mendoza (the quartet) started skimming money from Data and Western. Although the record does not contain details of the early skims, some of the sources or methods by which cash was accumulated were from company vending machines, undeposited customers' checks, and sales of scrap metal, scrap circuit boards, and excess gold. In addition, the quartet also arranged with third parties to invoice Data and Western for products or services which were never rendered, keeping the resulting payments from Data and Western, less a small commission to the third parties. Initially, *150 the skimmed money was kept in petitioner's safe at his residence. Periodically, the funds were withdrawn from the safe for various investments by the quartet and, occasionally, for individual investments by petitioner. In 1975 the quartet stopped keeping the money in the safe at petitioner's home. Instead, a floor safe was installed at Data, and the money was moved to the floor safe. All deposits and withdrawals to the safe were recorded in spiral notebooks. The quartet had a rule that the safe could not be entered unless two of the four individuals were present. Generally, Turner or Walter made the entries in the spiral notebooks. The largest amount of money kept in the safe at any given time, prior to 1977, was between $ 400,000 and $ 500,000. Around June 1977, as a result of an impending audit by respondent, all of the money was taken from the floor safe and divided among the quartet. At that time, petitioner instructed Turner to take the spiral notebooks home and destroy them. She allegedly did so, although a copy of some pages turned up later as part of a blackmail scheme, not relevant hereto. However, the skimming procedures did not stop at that time. A safe deposit *151 box was opened at a local bank in the name of a college friend of Turner's, although she kept the keys for entry to the box. Skim money was then deposited in the safe deposit box. In November 1977, the quartet took all the money out of the safe deposit box and divided it according to their respective percentages, as determined by Walter. Turner believed that petitioner and the others had decided to stop the skimming. After Data was incorporated, Turner was in charge of payroll, personnel, invoicing, and correspondence work. She continued to work for Data until she had a baby in October 1978. Subsequent to the birth of the child, she returned to Data and found that she was locked out. All of the locks on the doors, her desk drawer, and the safes had been changed. She no longer worked for Data, but continued to receive funds from Data as a "consultant". In addition, in 1978 and 1979, Turner received envelopes containing cash and computations prepared by Walter, which reflected the distribution of cash funds. For example, on May 24, 1979, Turner received $ 1,210.26 from a total distribution of $ 6,266.71 and on June 19, 1979, Turner received $ 1,067.10 out of $ 5,525.43. In *152 each instance, it represented a 19.3125-percent share. On May 15, 1981, Turner received an envelope from petitioner containing $ 2,709.84 in cash and a piece of paper indicating that the amount was 19.3125-percent of $ 14,031.51. In each instance, one individual purportedly received 58.0625-percent of the skim. Based upon relative stock ownership percentages, that individual could have been petitioner. The skimming was ongoing. In fact, Turner became suspicious that she was not getting her fair share of the skim. After discussions with the other members of the quartet and a surreptitious examination of Data's records, she confronted petitioner with her suspicions. He refused to talk with her unless she agreed to sell him her Data and Western stock. In 1982, Turner sued, inter alia, petitioner, Walter, Mendoza, Western, and Data to get her fair share of the post-1977 skim. That litigation (the Turner litigation) was settled pursuant to which Turner sold her Data and Western stock to petitioner and received $ 720,000 in property, plus $ 465,000 for attorney's fees. Sales of Gold Salts
In 1980, Lew Thorson (Thorson) formed Reliable Recovery (Reliable). The business of *153 Reliable was to refine gold from gold salts. During the years 1980 through 1983 (and beyond), petitioner and Thorson operated a scheme for milking Western and Data. Invoices were prepared by Reliable showing sales of gold salts to Western and Data. The sales were planned so that the amount of each "sale" did not exceed $ 10,000. After petitioner's corporations paid the invoices, the checks would be cashed and the funds turned over to petitioner, less a 5-percent commission for Thorson. Checks from Data and Western to Reliable in the years 1980 through 1983 totaled as follows: Year
Data Western 1980
$ 82,943.75
$ 156,393.45
1981
134,163.75
144,124.45
1982
117,869.80
132,086.64
1983
81,546.00
266,153.67
Some of the checks were for legitimate purchases of gold salts used by Data and Western in their manufacturing processes, but no credible evidence was offered to distinguish the real sales from the phony sales. Cash Transactions with Hastin
Buel James Hastin (Hastin) was a friend and business associate of petitioner. In the years 1978 through 1980, Hastin developed major financial problems due to family members' health care bills and a downturn in the *154 real estate market. Hastin discussed his financial problems with petitioner, who offered to pay Hastin six percent of the amount of certain checks drawn on Data if Hastin would cash them for him. On January 18, 1979, after Hastin had cashed some checks, at the request of petitioner and Walter, Hastin signed a contract stating that he was representing Data in sales transactions with Abbott Labs and Micro Data Labs. (Hastin did not, in fact, represent Data in sales transactions.) In addition, Hastin was provided with health insurance and medical benefits through Data. In the manner described, Hastin received and cashed Data checks for $ 45,000 in 1980 and $ 20,000 in 1981. After deducting his commission, Hastin returned the funds to petitioner, generally in the form of cashier's checks. In December 1979, petitioner took $ 80,000 in cash to Hastin's office and asked him to go to various banks and purchase cashier's checks for amounts under $ 10,000. When Hastin delivered the cashier's checks to petitioner, petitioner persuaded Hastin to wire a quarter of a million dollars to an attorney in the Bahamas. Petitioner told Hastin that the money was being sent to the Bahamas so that *155 he could bring it back into the United States as a loan. Petitioner instructed Hastin to wire the money because he did not want a record of the money going to the Bahamas in his own name. Petitioner admitted at trial that he once requested Hastin to wire $ 100,000 to the Bahamas for him. After Turner filed her suit, petitioner met with Hastin at Data's office on May 24, 1982, and tried to get him to cover up the skimming and check cashing scheme. During the course of the Turner litigation and this litigation, petitioner attempted to intimidate Hastin to testify in his favor. [3]
Unreported *156 Interest Income
In early 1980 Al Reda (Reda) needed money. He was told by an employee, Betty Hales (wife of Turner's nephew), that petitioner might loan him money. Reda approached him through petitioner's attorney, Gary Pond (Pond), and asked to borrow $ 20,000. Petitioner loaned Reda $ 20,000 and Reda executed a note for $ 22,400, which he timely repaid within 30 to 45 days. Also in 1980, shortly after the first loan, Reda borrowed $ 50,000 from petitioner and repaid him $ 73,500. Reda picked up the $ 50,000 in cash from petitioner at his home. Petitioner told Reda that he kept the cash at his house because he was selling circuit boards overseas and did not want the cash going through his bank account. Petitioners did not report the interest payment of $ 23,500 on their 1980 Federal income tax return. In 1979, Reda purchased a 38-unit apartment building in Dallas, Texas, from Mr. and Mrs. Anglins, for $ 24,000 in cash and a wrap-around mortgage of $ 120,000. The mortgage wrapped around a $ 60,000 first deed of trust that the Anglins owed on the property. Reda missed a payment or two and was notified that the mortgage was being foreclosed. Reda contacted petitioner and *157 requested a loan to stop the foreclosure. At petitioner's instruction, Reda executed a note for $ 175,000 payable to Pond, and Pond flew to Dallas to pay the Anglins $ 126,832.62. Although Pond paid the Anglins, the first deed of trust was not extinguished. Pond, on petitioner's behalf, continued the foreclosure action and took title to the property as petitioner's nominee. Reda attempted to reclaim the property. On October 30, 1980, Reda paid petitioner $ 50,000 by cashier's check and gave a deed of trust for $ 375,000 to Pond from Reda's corporation, Union Continental Investment Company, Inc. The $ 375,000 was to be repaid in 270 days from October 30, 1980. Interest was to be paid to petitioner in the amount of $ 30,100, accruing at $ 4,380 per month, beginning December 30, 1980, and continuing until July 28, 1981. In 1981, petitioner received more than $ 17,000 in interest income from Reda. Petitioners did not report any interest income received from Reda in 1981 on their 1981 Federal income tax returns. Net Worth Determination
As a result of respondent's agents' being unable to reconcile petitioners' returns with their books and records, respondent determined their *158 unreported taxable income by the net worth method. The parties have stipulated to a correct net worth computation, reserving only the issues raised by petitioner as to cash on hand and additional liabilities. That computation reflects unreported taxable income as follows: Year
Amount
1980
$ 1,098,895.72
1981
644,489.66
1982
362,532.10
1983
94,169.30
The net worth computation utilizes the amount of $ 1,000 for petitioners' cash on hand on December 31st of each of the years 1979 through 1983. In addition, the computation does not take into consideration purported loans made to petitioner by Improved Construction Company (ICC) and/or Improved Construction Limited (ICL), the details of which are set forth below. During the years in issue, as well as prior thereto, petitioners acquired interests in various parcels of real estate. In the course of those acquisitions, petitioners applied for and obtained financing, primarily from the United California Bank. Those applications contained petitioner's balance sheets and/or financial statements, reflecting minimal amounts of cash on hand, as of the dates of the applications. The amounts listed therein ranged from a low *159 of $ 200 in August 1980, to a high of $ 950 in February 1983. At the closings of some of the real estate transactions, petitioners deposited with the escrow agent numerous cashier's checks, usually in amounts slightly less than $ 10,000. Petitioner regularly employed Pond, Mrs. Savage, and some of her relatives, to convert cash into cashier's checks of less than $ 10,000. Nevertheless, at trial, petitioner claimed that he generally had cash on hand ranging from $ 50,000 to $ 150,000, and that the amounts on hand at the end of any particular year did not significantly vary. However, he kept no records to reflect his cash dealings. Sometime in 1978, petitioner became acquainted with Cyril Fountain (Fountain) through Pond's assistance. Fountain is an attorney residing in the Bahamas. Pond had previously been able to arrange loans for other clients through Fountain. As a result of the introduction, petitioner discussed with Fountain, from time to time, his need for loans, which Fountain relayed to his sources. Such purported loans were initially granted through Fountain by a group of individuals referred to as ICC. The principals behind ICC are not known because Fountain refused *160 to disclose them in various depositions. Subsequently, in 1980, Fountain formed the Bahamian corporation ICL, and additional loans were allegedly made to petitioner by ICL through Fountain. Again, Fountain refused to identify any principals of ICL. He stated in his depositions that petitioner was not a principal of either entity. For each of the purported loans, petitioner apparently prepared the promissory notes in California and sent them to Fountain in the Bahamas. The proceeds of the loans were allegedly delivered to petitioner in several ways: By wire transfer to Pond, by delivery by unidentified individuals in cash to petitioner at his residence, and, in one instance, by delivery of cash in a briefcase to petitioner in a Miami hotel room by two individuals, whom petitioner has not been able to identify. By these mechanisms, petitioner purportedly borrowed from ICC or ICL the following sums on the following dates: Date
Amount
April 3, 1978
$ 85,000
June 18, 1978
530,000
January 4, 1979
90,000
May 1, 1979
80,000
August 8, 1979
200,000
January 3, 1980
140,000
March 1, 1980
80,000
May 1, 1980
340,000
June 1, 1980
500,000
July 22, 1980
150,000
December 1, 1980
350,000
January 3, 1981
735,000
February 27, 1981
575,000
January 3, 1982
250,000
January 15, 1982
200,000
January 5, 1983
125,000
*161 Petitioner maintained no books and records to show the receipt of any funds purportedly received in the manner above described. No witnesses testified to having seen any specific funds delivered to petitioner. Fountain, whose deposition was taken in the Bahamas (both in the Turner litigation and in the instant case), although refusing to disclose the names of his principals and relying substantially upon various privileges allegedly existing under Bahamian law, was unable to establish that he ever witnessed any funds being paid to petitioner. Fountain stated that he put petitioner in contact with ICC and ICL and that the parties would transact their business. Petitioner did not maintain records showing the disposition of any funds allegedly received as described above. Petitioner maintained bank accounts during these years, and several large deposits to the accounts have been identified. However, none of those deposits bear any numerical or time relationship to the alleged receipt of funds from ICC or ICL. During the course of the examination, respondent's agents asked petitioner about the sources of his increase in net worth. Initially, because a special agent was involved *162 in the investigation, petitioner relied upon his Fifth Amendment rights against self-incrimination. Subsequent to the criminal proceeding, petitioner, through his counsel, disclosed the existence of the alleged promissory notes and loan transactions, but refused to grant any waivers to respondent's agents so that they might be able to obtain bank records showing the transfers of funds from the Bahamas to petitioner or Pond. Subsequent to the issuance of the notice of deficiency, petitioner submitted the waivers, but little corroborating evidence was obtained. Nevertheless, documents showing the following were submitted in partial support of the promissory notes and loan transactions: a. On February 2, 1981, $ 225,000 was wire transferred to Pond's trust account 2; b. On March 3, 1981, $ 99,992 was wire transferred from the United States to Fountain. On March 4, 1981, $ 100,000 was sent from Fountain to Pond; c. On April 7, 1981, $ 100,000 was wire transferred from Fountain to Savage Rentals and/or petitioner; d. On an unknown date in July 1981, $ 100,000 was wire transferred from Fountain to petitioner; and e. On August 21, 1981, $ 90,000 was transferred from Fountain *163 to Pond. These transfers bear no obvious relationship to the alleged loans. The transactions of March 3 and 4, 1981, reflect that money may have been sent to Fountain for the purpose of having it sent to petitioner. The record also contains other exhibits showing cash being sent from petitioner to Fountain commencing on December 29, 1983, with a cashier's check in the amount of $ 40,000. In 1984, sums in excess of $ 1,000,000 were wire transferred from petitioner to Fountain. Again, no records were submitted to show (a) the source of these funds or (b) the ultimate destination of these funds. Petitioner caused to be recorded, in the records of San Bernardino County, a document purporting to convey a security interest to ICL in certain property in that county allegedly to secure a debt of $ 850,000. On that document, dated November 12, 1981, the address of ICL is listed in care of Pond. In 1988, petitioner was engaged in a transaction disposing of certain real estate, and the proceeds of that transaction ($ 1,400,745.65) were wire transferred to Fountain. No records have been submitted to establish the ultimate destination of those funds. The promissory notes provided for *164 prime rate interest at the Bank of America, determined on a quarterly basis on the last day of each quarter, and were payable seven years thereafter. It is unclear from the notes and the testimony whether the interest was to be computed on a simple or compound basis. During the course of the Turner litigation, petitioner made similar contentions with regard to loans from ICL and ICC. Therein, petitioner submitted three additional notes: January 29, 1981, in the amount of $ 225,000; March 4, 1981, in the amount of $ 100,000; and April 10, 1981, in the amount of $ 100,000. When the purported promissory notes were submitted by petitioner to respondent's agents, these three notes were not included. The form of the three notes is different from the form of all the other notes. In particular, they reflect Bahamian corporate seals and notarization by Fountain's employees. Criminal Tax Evasion Conviction (Section 7201) for 1982 and 1983
On April 14, 1988, petitioner was indicted by a Federal Grand Jury on four counts. Counts three and four pertained to alleged attempted evasion of petitioner's Federal income taxes for taxable years 1982 and 1983, in violation of section 7201. *165 Petitioner pled guilty to counts three and four of the indictment pursuant to a negotiated plea agreement dated September 1, 1988. On November 17, 1988, the United States District Court for the Central District of California entered a Judgment and Probation/Commitment Order by which petitioner was sentenced to imprisonment for a period of two years on count three, pursuant to the release provisions of 18 U.S.C. 4205(a) (1988), and a fine of $ 50,000. As to count four, petitioner was ordered to pay a fine of $ 50,000; execution of sentence as to imprisonment was suspended, and petitioner was placed on supervised probation for five years. Claimed Net Operating Loss
On their 1985 Federal income tax return, petitioners show adjusted gross income of $ 15,562 and itemized deductions of $ 132,536, of which $ 105,774 consists of legal fees. With leave of the Court, petitioners, on August 21, 1990 (and subsequent to the notice of trial issued by the Court), filed an amended petition claiming a net operating loss carryback from 1985 to 1982. Respondent verified that petitioner had paid $ 103,281 in legal fees in 1985 of which $ 3,337.50 ($ 1,337.50 paid to the law firm Laski and *166 Gordon plus $ 2,000 paid to Thomas Sheridan) are conceded by respondent to be deductible legal expenses. ULTIMATE FINDINGS OF FACT 1. Petitioners substantially understated their gross income for 1980 through 1983 as reflected in respondent's net worth determination. 2. The underpayments of income taxes required to be included in petitioners' Federal income tax returns for 1980 through 1983 were due to the fraud of petitioner Huey P. Savage with intent to evade tax. 3. The assessment and collection of petitioners' Federal income taxes for 1980 and 1981 are not barred by the statute of limitations. OPINION 1. Understatements of Income -- Net Worth Determination
As reflected in our Findings of Fact, respondent determined petitioners' taxable income for each of the years 1980 through 1983 by using the net worth method. Petitioners have the burden of proving that respondent's determinations, as set out in the notice of deficiency, are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Something more than an assertion that respondent has erred and no taxes are owed is needed to sustain that burden. Roberts v. Commissioner, 62 T.C. 834, 839 (1974). *167 Petitioners must produce credible evidence to substantiate their claims. Cosmopolitan Credit Corp. v. Commissioner, T.C. Memo. 1972-103, affd. per curiam without published opinion 474 F.2d 1344 (5th Cir. 1973). When petitioners were examined by the Internal Revenue Service, the special agents utilized the books and records provided by petitioners. The books and records that were audited were reconciled to corporate income tax returns as filed. The related items reported on petitioners' individual Federal income tax returns were the same as those reflected on the corporate books. However, the special agents discovered that the records did not accurately reflect specific items of income received by petitioner. In addition, the amounts of income reported did not account for the capital assets petitioner was purchasing and the expenditures he was making. Therefore, respondent used the net worth method to calculate petitioners' taxable income. When the agents attempted to interview petitioner he declined on the basis of the Fifth Amendment. Despite repeated requests to petitioners' counsel, the agents were not furnished with requested waivers *168 and were given only scant documentation regarding petitioner's financial dealings. Petitioners failed to produce adequate records to determine their income for the years in issue. Therefore, respondent was justified in using an indirect method of proof. Holland v. United States, 348 U.S. 121 (1954). The use of an indirect method of proof is proper even when the books and records maintained by taxpayers support the returns as filed. Harper v. Commissioner, 54 T.C. 1121, 1129 (1970). The parties have stipulated to petitioners' net worth as of December 31, 1979, December 31, 1980, December 31, 1981, December 31, 1982, and December 31, 1983, except for (1) cash on hand and (2) the alleged Bahamian loans from ICC and ICL. In addition, respondent determined in her deficiency notice that petitioners had unreported income in the amounts of $ 1,098,895.72, $ 664, $ 667.66, $ 361,199.10, and $ 63,528.30 in 1980, 1981, 1982, and 1983, respectively. The parties agreed that due to a minor change to the basis of a piece of rental property in 1981, the amounts stipulated for trial purposes should be $ 644,489.66 for 1981, $ 362,532.10 for 1982 and *169 $ 894,169.30 for 1983. The 1980 amount remains unchanged. As to cash on hand, our Findings of Fact show that petitioner dealt extensively in cash, but failed to maintain adequate records thereof. Petitioners also refused, up to the date of trial, to tell respondent the amount of their cash on hand for the years in issue. Respondent used a $ 1,000 cash on hand figure as a starting point in the net worth computations. The determination was based on the fact that $ 1,000 was the largest amount of cash on hand reported by petitioners on various financial statements which were filed with various banks during the years 1977 through 1983. The cash on hand amounts shown on the financial statements did not materially vary from year to year. Hence, respondent did not vary the cash on hand amount used for the computations of petitioners' net worth. Cash on hand, or the lack of it, may be shown by financial statements filed with lending institutions. Friedberg v. United States, 348 U.S. 142 (1954). At trial petitioner testified that on January 1, 1980, he had cash on hand ranging from $ 50,000 to $ 150,000 and that the amount of cash on hand did not change materially *170 during the years in issue. Therefore, regardless of which cash on hand amount the Court uses as a starting point, the determination of the increase in petitioners' net worth is unaffected because the amount remained constant. Accordingly, we sustain respondent's determination in this regard. As to the alleged loans from ICC and ICL, petitioner failed to prove that the transactions occurred. He attempted to convince us that he was borrowing substantial sums, which, when factored into a net worth computation, would result in sizeable losses in each year. While it is possible that petitioner did, at some time, obtain some funds from Fountain, he did not maintain adequate records to prove any specific amount. We think he intended to maximize on his relationship with Fountain by preparing, at will, purported promissory notes to reflect any amount of loan that he desired. We do not believe that any cash money was delivered to petitioner at his home or office by representatives of ICC or ICL, and there is insufficient evidence of money wire transfers between petitioner and Fountain to corroborate the promissory notes as genuine. To be sure, there is credible evidence to support respondent's *171 contention that petitioner was actually sending and receiving funds to and from Fountain in order to create the illusion that he was borrowing large amounts of money. We simply cannot conceive of a group of individuals that would loan large amounts of cash with little or no security at high interest rates with no repayment schedules or reconciliations of balances due and owing from time to time. No records were kept of receipt of funds or their disposition. Petitioner did make extensive use of banks for deposits and loans. It would have been a simple matter to have deposited any loan proceeds to his accounts. Petitioner did not explain why, with this readily available source of cheap money, he had to finance his real estate purchases locally at higher interest rates. If indeed there were some loans as claimed, petitioner has failed to show the amounts or dates thereof, or their unpaid balances at year-end during the relevant periods. Petitioner also contends that respondent failed to follow up pertinent leads as to the loans. See Holland v. United States, 348 U.S. 121 (1954). However, the Government is not required to exhaust all possible means of investigating *172 every lead regarding a taxpayer's nontaxable sources of increased net worth. "The government must investigate and negate a taxpayer's explanation only if it is 'reasonable' and 'reasonably susceptible of being checked'". United States v. Ayers, 924 F.2d 1468, 1476 (9th Cir. 1991). Where a taxpayer chooses to furnish leads to a purported nontaxable source, at least a minimal burden is upon the taxpayer to aid in the investigation of the nontaxable source. When a taxpayer chooses to make loan transactions with foreign banks, in countries which impose secrecy laws preventing access to information from those banks, it is the taxpayer that is in the best position to give useful information to the Government regarding his financial dealings with regard to those loans. United States v. Ayers, supra.In this case we think respondent's agents met their duty. They summoned records, interviewed third parties, read Fountain's deposition, and examined the information provided by petitioners. When they finally obtained the necessary waivers from petitioner as to the Bahamian bank transactions, little corroborating information was discovered. *173 Most likely, it was too late to prove that no additional evidence had ever existed. Accordingly, we sustain respondent's determinations with respect to the understatements of income, as modified by the parties' stipulation. 2. Section 6653(b) Additions to Tax for Fraud
The next issue is whether respondent correctly determined that petitioner is liable for the additions to tax for fraud for each year, 1980 through 1983. The issue of fraud is one of fact to be decided upon consideration of the entire record. Stratton v. Commissioner, 54 T.C. 255, 284 (1970), supplemented by 54 T.C. 1351 (1970). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To establish the existence of fraud respondent must prove that petitioner underpaid his joint income taxes for the years in issue and that a part of each underpayment was due to fraud. Stone v. Commissioner, 56 T.C. 213, 220 (1971). Fraud is established by proving that petitioner intended to evade tax, believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); *174 Gajewski v. Commissioner, 67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not imputed or presumed, but must be established by independent evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). However, fraud may be proven by circumstantial evidence because direct proof of intent is rarely available. Spies v. United States, 317 U.S. 492, 499 (1943); Rowlee v. Commissioner, supra.Wrongful intent may be inferred from certain "badges of fraud", which include, among other things, consistent and substantial understatements of income, concealment of property, and failure to cooperate with respondent. Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), affg. T.C. Memo. 1986-223. We hold that respondent has proved petitioner's fraud by clear and convincing evidence for 1980 and 1981, and that petitioner is collaterally estopped to deny the existence of fraud for 1982 and 1983. In the years before us petitioner evaded his Federal income *175 taxes by skimming funds from his two closely held corporations, Data and Western. He diverted the funds in various ways. He caused blanket invoices to be made for materials such as gold salts, and then had corporate checks issued to pay for the invoiced materials. The materials were not supplied to Data or Western. The supplier would take the check, cash it, and give petitioner back 94 to 95 percent of the cash. He did not report the income received in this manner. He also took, for his own use, gold scrap from Data and Western, money from vending machines, and bottles of gold salts paid for by Data and Western. The funds petitioner received in this manner were not reported on petitioner's Federal income tax returns. He utilized some of the diverted funds to loan money to various individuals. He charged the individuals excessive interest and did not report the interest paid to him on his tax returns. In addition, petitioner had Data and Western checks issued to people for services which were not rendered. Each person cashed the checks and returned the cash to petitioner, keeping a small percentage. Petitioner purchased rental property in the name of other people, kept *176 the rental income and did not report it on his tax returns. Petitioner used people, including his relatives, his customers, his friends, his employees, his bookkeeper, and his attorney to evade paying his taxes. He had people purchase cashier's checks in their names with the skimmed money for amounts under $ 10,000 to avoid currency reporting laws and Internal Revenue Service scrutiny. He persuaded people to create false invoices, falsify their own tax returns, sign false contracts, execute false affidavits, and lie under oath to cover up his nefarious conduct. Petitioner also utilized the Bahamas, a tax haven country, to transfer cash out of the reach of the Internal Revenue Service. He had promissory notes drawn up in the name of ICC and ICL to make the funds that he had skimmed appear to be nontaxable loans. The indicia of petitioner's fraud are overwhelming. He consistently and substantially understated his taxable income for several years. He concealed the ownership of property by holding title in the names of relatives and employees. He engaged in fraudulent check cashing schemes using phony invoices. He made extensive use of cash in transactions to avoid the tracing *177 of income. He concealed cash in offshore banks. He created false documents relating to nonexistent loan transactions. And, finally, he failed to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Based on the clear and convincing evidence in this record, we have found that part of the underpayments of tax for 1980 and 1981 was due to petitioner's fraud. Since petitioner entered a guilty plea to two counts of Federal income tax evasion under section 7201 for 1982 and 1983, he is collaterally estopped by the judgment of conviction from denying that part of the underpayment of tax for each of those years is due to fraud with intent to evade tax. Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68 (1964). See also Tomlinson v. Lefkowitz, 334 F.2d 262 (5th Cir. 1964); Meier v. Commissioner, 91 T.C. 273, 282-293 (1988); Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Accordingly, we sustain the additions to tax under section 6653(b) for the years 1980 *178 through 1983. 3. Statute of Limitations
We reject petitioners' contention that the assessment of any Federal income taxes due by them for the years 1980 and 1981 is barred by the statute of limitations. Having held that part of the underpayment of tax for each of the years 1980 and 1981 was due to petitioner's fraud, it follows that the assessment of deficiencies for those years is not barred by the statute of limitations. Sec. 6501(c)(1); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972). Even if only one spouse is fraudulent, and a joint income tax return is filed, fraud prevents the running of the statute of limitations as to both spouses. Stone v. Commissioner, 56 T.C. 213 (1971); Dante v. Commissioner, T.C. Memo. 1978-126; Stone v. Commissioner, T.C. Memo. 1977-147. Here petitioner willfully attempted to evade his income taxes and filed fraudulent joint returns for 1980 and 1981. Therefore, the statutory period for assessment have not expired for those years. Benjamin v. Commissioner, 66 T.C. 1084, 1100 (1976), *179 affd. 592 F.2d 1259 (5th Cir. 1979). 4. Section 6661 Additions to Tax
Respondent determined that petitioners are liable for additions to tax under section 6661 for 1982 and 1983. Section 6661(a) provides that, if there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). There is a substantial understatement of income tax for any taxable year if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). Respondent determined that petitioners understated their income tax in 1982 by $ 150,036 and in 1983 by $ 17,247. The amounts of income tax claimed to be due, as shown on petitioners' returns for 1982 and 1983, were $ 3,069 and none, respectively. Therefore, the understatements were substantial. The amount of understatement may be reduced by the portion thereof for which the taxpayers can show that there was substantial authority for its treatment on the return. *180 Sec. 6661(b)(2)(B)(i). The substantial understatements in this case are due to unreported income. There is no substantial authority for failing to report income. Farah v. Commissioner, T.C. Memo. 1987-327. Accordingly, the additions to tax under section 6661 are sustained. 5. Claimed Net Operating Loss
Shortly before trial, petitioners amended their petition and alleged they had a net operating loss in 1985, which they were entitled to carryback to their 1982 taxable year. Section 172 provides for the deduction and carryback of a net operating loss by individual taxpayers. Petitioners have the burden of proof on this issue. Rule 142(a). Petitioners must establish that they had deductible items which created a loss in 1985, that such loss was an operating loss which was not absorbed by their gross income in 1985. Petitioners fail on all counts. Most significantly, petitioners have not proved that the income shown on their 1985 return was correct as filed, and that they have reported all the income they received in 1985. In fact, the evidence is clear that petitioner's skimming from Data and Western continued into 1985. In these circumstances *181 it was incumbent upon petitioners to show that 1985 was not different from prior years, and that they did not have unreported income in 1985. They failed to do so. This is particularly true when the claim was made so late and insufficient time was available for a complete audit by respondent. Thus, we need not discuss whether all of the legal expenses were deductible, or whether such deductions gave rise to an operating loss. Accordingly, we hold that petitioners are not entitled to a carryback of the net operating loss claimed in 1985 to offset their 1982 tax liability. 6. Claimed Innocent Spouse Relief
At the conclusion of trial, petitioners orally moved to dismiss the deficiencies with respect to Jori Savage. They made no allegations to that effect in their petition, nor have they filed an amended petition to raise the issue. Moreover, they have not presented any evidence to establish that Jori Savage qualifies as an innocent spouse under section 6013(e). No evidence was presented as to her income in the preadjustment year (section 6013(e)(4)), her knowledge as to the unreported income, her lifestyle, or any reason why it would be inequitable to hold her liable for *182 the deficiencies. Therefore, her claim is rejected. It therefore follows that petitioners' oral motion to dismiss the deficiencies with respect to Jori Savage will be denied. To reflect our conclusions on the disputed issues and the concessions of the parties in the net worth computation, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent conceded the fraud issue with respect to petitioner Jori Savage for all years before the Court. Moreover, respondent has not argued that Jori Savage is liable for the additions to tax for negligence in the alternative. Therefore, we conclude that respondent has also conceded these additions to tax.↩
3. Respondent offered into evidence a tape recording, and transcript thereof, of a telephone conversation between petitioner and Hastin, to which petitioner objected. There is sufficient evidence in the record to support our finding as to intimidation without the need to utilize that exhibit. We have neither listened to the tape nor read the transcript. Accordingly, petitioners' objection is moot and need not be considered.↩